Opinion

per curiam:

These are actions brought by plaintiff for active duty, pay and allowances as a major for a period subsequent to August 19,1944. Case No. 49800, filed August 31, 1950, asks for active duty pay and allowances for the *842 period August 20,1944 to date of judgment. Case Cong. No. 6-56, filed June 27, 1956, is a referral pursuant to Senate Resolution 233, 84th Congress, 2nd Session, referring S. 98 “A bill for the relief of Marion G. Denton.” The cases were consolidated for trial and referred to Commissioner Mastín G. White, pursuant to Rule 45 (c) with directions to make findings of fact and recommendations for conclusions of law to which this court should arrive.
Accordingly, Commissioner "White has submitted findings of fact, together with an opinion recommending that Case No. 49800 be dismissed, and that the Congress be advised that Marion G. Denton does not have a valid claim, legal or equitable, against the United States.
Since the court agrees with the recommendations and findings of the Commissioner, as hereinafter set forth, it hereby adopts the same with this exception regarding the issue of “The Appointing Authority.” The plaintiff urges that if the court should hold that in cases in which the normal appointing authority is the accuser, the appointment may be made by a superior officer outside the chain of command, the accusing superior may select an appointing authority anywhere in the service, and may select one who shares his animosity against the accused. The instant case presents no such problems.
According to the plaintiff’s interpretation of the Army Regulations, the President of the United States was the only competent appointing authority. Colonel Wimsatt who, except for the fact of his being the accuser, would have been the appointing officer, did not attempt to select an appointing authority. He forwarded the charges against the plaintiff to the War Department. The Secretary of War, after taking the advice of the Judge Advocate General of the Army, caused the War Department General Staff to take the necessary steps looking to the convening of a general court martial at the Headquarters, First Air Force at Mitchel Field, New York, and to the appointment of the court by the Commanding General of the First Air Force. The papers were signed “By order of the Secretary of War.”
The court was appointed and the plaintiff was tried and convicted. There is no claim that the Commanding Gen *843 eral liad any prejudice against tbe plaintiff, or that the members of the court were in any way unfit to serve, if properly appointed.
If the court had been “appointed” by the President, as the plaintiff says it should have been, quite certainly he would not have given his personal attention to the problem. He would have relied upon his Secretary of War, who would have relied upon his General Staff and the Judge Advocate General to prepare the papers and fill in the details. We think everything was done as the plaintiff would have wanted it done, except that the wrong words were written on some papers. If they had said “By order of the President,” and had contained names of persons selected for the court by the Secretary’s staff, after advising with the Commanding General of the First Air Force, that would have fulfilled the formal requirements. But the difference would have been only a formal one. We see no indication that it would have affected the outcome of the case and we would, therefore, disregard the departure from formal correctness if there was such a departure.
Plaintiff’s petition in No. 49800 is dismissed, and the court’s opinion, together with the findings of fact in Cong. No. 6-56, will be certified to the Congress pursuant to S. Bes. 233, 84th Congress, 2nd Session, with the advice that Marion G. Denton does not have a valid claim, legal or equitable, against the United States.
It is so ordered.
OPINION OP THE COMMISSIONER
After the plaintiff had filed case No. 49800 in the Court of Claims and the defendant had submitted to the court a motion for summary judgment, the Senate on March 26, 1956 referred to this court S. 98, 84th Congress, “A bill for the relief of Marion G. Denton.” In doing so, the Senate by resolution called upon the court to make “such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.” Thereafter, the *844 court denied the defendant’s motion for summary judgment without prejudice and, at the plaintiff’s request, consolidated the regular case and the Congressional-reference case for further proceedings.
In the consolidated cases, the plaintiff seeks to obtain, either by means of a court judgment or by means of a legislative enactment, a sum of money representing the pay and allowances which (according to the plaintiff) he was entitled to receive, but did not receive, as an Army major for a period subsequent to August 19, 1944.
On August 19, 1944, the plaintiff .was dismissed from the military service pursuant to a sentence which a general court-martial imposed upon him after convicting him of charges alleging willful disobedience of a lawful command of a superior officer, in violation of Article of War 64 (41 Stat. 801),[1] and which the President duly confirmed following intermediate review and approval by the appropriate military authorities. The plaintiff asserts that the action of the court-martial in convicting and sentencing him was void because:
(1) the command that he disobeyed was unlawful;
(2) the general court-martial that convicted and sentenced him was appointed by an officer who lacked the authority to appoint a general court-martial for the trial of Ms case; and
(3) he was denied the effective assistance of counsel in connection with his court-martial trial.
It is necessary to discuss each of the plaintiff’s contentions in considerable detail for a proper understanding of the issues involved in the consolidated cases.
1. The Command
Article of War 64, under which the plaintiff was convicted and sentenced by a general court-martial, provided in pertinent part as follows:
Any person subject to military law who * * * willfully disobeys any lawful command of his superior officer, shall suffer death or such other punishment as a court-martial may direct.
*845 In order for the court-martial to convict tibe plaintiff of a violation of the statutory provision quoted above, it was necessary for the court-martial to find on the basis of the evidence before it:
(a) that the plaintiff received a certain command from a certain officer, as alleged;
(b) that such officer was the plaintiff’s superior officer;
(c) that the plaintiff willfully disobeyed such command; and
(d) that such command was lawful.
Therefore, the lawfulness of the command was one of the essential elements of the offense charged against the plaintiff in the court-martial case, and the action of the court-martial in convicting the plaintiff necessarily involved a finding by the court-martial that the command which the plaintiff disobeyed was a lawful command.[2] With respect to the plaintiff’s contention that the evidence before the court-martial didfnot justify its finding on this point, it is necessary to 'state at the outset that the Court of Claims does not have the authority, in the exercise of its regular jurisdiction, to consider such an allegation and grant relief upon it if found to be correct.
A conviction and sentence by a court-martial, when duly affirmed by the military authorities, cannot be set aside or disregarded by a civil court unless the action of the court-martial was void. Carter v. McClaughry, 183 U. S. 365, 401 (1902). It is the traditional doctrine in American jurisprudence that a civil court, in passing upon a conviction and sentence by a court-martial, can only consider whether the court-martial had jurisdiction of the person and of the offense, and, if so, whether the court-martial acted within the scope of its lawful powers. Johnson v. Sayre, 158 U. S. 109, 118 (1895); Swaim v. United States, 165 U. S. 553, 561 (1897); Carter v. Roberts, 177 U. S. 496, 498 (1900); Mullan v. United States, 212 U. S. 516, 520 (1909). In recent years, however, there has been a tendency to expand the scope of *846 the consideration in order to determine whether the court-martial protected the constitutional rights of the accused. Burns v. Wilson, 346 U. S. 137, 142 (1953); Shapiro v. United States, 107 C. Cls. 650, 653 (1947).
It is clear that a civil court cannot properly consider whether the evidence before a court-martial was sufficient to show the commission of an offense, since an error upon the part of the court-martial in evaluating the evidence before it would not make the judgment of the court-martial void. Swaim v. United States, supra, at pp. 561-562; Humphrey v. Smith, 336 U. S. 695, 696 (1949); Hiatt v. Brown, 339 U. S. 103, 110 (1950); Whelchel v. McDonald, 340 U. S. 122, 124, 126 (1950); Sanford v. Robbins, 115 F. 2d 435, 437 (C. A. 5, 1940), cert. denied 312 U. S. 697. The plaintiff says that a court-martial conviction upon charges alleging willful disobedience of a lawful command of a superior officer would be a denial of the “due process of law” guaranteed by the Fifth Amendment if the command was actually unlawful. However, a wrong decision on the merits does not constitute a denial of due process of law, if the opportunity for a full' hearing is afforded. United States v. Gallagher, 183 F. 2d 342, 345 (C. A. 3, 1950), cert. denied 340 U. S. 913.
The legal conclusion stated above does not, in the present instance, wholly dispose of the plaintiff’s contention concerning the lawfulness of the command that he disobeyed, since the Senate has called upon the Court of Claims to furnish advice as to whether the plaintiff has an equitable claim against the United States growing out of his dismissal from the military service on the basis of his court-martial conviction and sentence. Accordingly, it seems appropriate to consider the lawfulness of the command which the plaintiff disobeyed, in order that advice may be furnished respecting the existence of an equitable claim upon the pai’t of the plaintiff. See Burkhardt v. United States, 113 C. Cls. 658, 667 (1949).
Prior to his dismissal from the military service, the plaintiff had been a longtime Reserve officer of the Army. After completing the course of training as a flying cadet during the period March 1918-May 1919 and securing a rating *847 as a military pilot, the plaintiff was commissioned as a second lieutenant in the Air Corps Reserve, Officers’ Reserve Corps, on May 16, 1919. After being commissioned, the plaintiff continued on active military duty until August 15, 1919, when he was given an honorable release from such duty. The plaintiff thereafter retained Ms commission as a Reserve officer of the Army; and from time to time during the ensuing 22 years, he served on active military duty for relatively short periods. Successive promotions up to the grade of major were received. Effective August 1, 1941, the plaintiff was ordered to, and entered upon, an extended tour of active duty in the Army as a major, Air Corps Reserve. He subsequently served continuously on such duty until August 19, 1944. During this period of service, the plaintiff was rated as a military pilot, but he was not in a flying status.
The series of events leading to the plaintiff’s trial and conviction by a general court-martial began in January 1943. At that time, there was in existence as part of the United States military establishment an independent oversea command known as the Greenland Base Command. Tliis command consisted of all the United States military installations located within the territorial limits of Greenland, comprising a total of 25 posts or stations.
One of the principal posts of the Greenland Base Command was located in the southern part of Greenland. It included the largest flying field in Greenland, with appurtenant service facilities and personnel, and also protective forces. This post had the code name of Bluie West 1, or BW-1, and the Army post-office address of APO 858.
Another major post of the Greenland Base Command was located on the east coast of Greenland, approximately 500 miles to the northeast of, and across the icecap from, BW-1. This post had the code name of Bluie East 2, or BE-2, and the Army post-office address of APO 679. The construction of a large flying field at BE-2 had been begun in the fall of 1942, and the construction work was still in progress during the early part of 1943.
The Commanding Officer of the Greenland Base Command was in general command of the entire area, of all *848 posts or stations located within the area, and of all operations, whether tactical or logistical, in the area. He maintained his headquarters at BW-1. Hence, there were two separate headquarters maintained at BW-1, i. e., the Post Headquarters and the Greenland Base Command Headquarters.
Personnel transferred from another command to the Greenland Base Command for service in the latter was transported to BW-1 in the first instance and, if destined for service at some other post, was then sent to such post after being processed through the Headquarters of the Greenland Base Command.
At the beginning of 1948, the Commanding Officer of the Greenland Base Command was Colonel Bobert W. C. Wimsatt; the Acting Post Commander of BW-1 was a Major Lloyd; and the Acting Post Commander of BE-2 was a Captain Jensen. Major Lloyd and Captain Jensen only had the status of acting post commanders because they were not rated as military pilots and it was the policy of the War Department for flying fields to be commanded by officers with pilots’ ratings, if reasonably available.
In January 1943, Colonel Wimsatt, the Commanding Officer of the Greenland Base Command, informed the War Department that he needed the services of two Air Corps officers with pilots’ ratings, one in the grade of major and one in the grade of lieutenant colonel, to serve as post commanders of flying fields in the Greenland Base Command. In requesting these officers, it was Colonel Wimsatt’s intention that the major should replace Captain Jensen as the Post Commander of BE-2 and that the lieutenant colonel should replace Major Lloyd as the Post Commander of BW-1.
The War Department did not, for a period of some months, furnish to the Greenland Base Command any officers possessing the qualifications referred to in the preceding paragraph, and Colonel Wimsatt addressed several follow-up inquiries to the War Department. He was anxious to obtain the two officers as soon as possible, since the flying field at BW-1 was already in operation and it *849 was anticipated that the flying field at BE-2 would be operational by the summer of 1943.
As of May 1943, the plaintiff was regularly assigned to the Army Air Forces Flexible Gunnery School at Buckingham Army Air Field, Fort Myers, Florida, but he was on temporary duty at Chanute Field, Rantoul, Illinois, for the purpose of attending the Technical Inspectors’ School there. The Army Air Forces Flexible Gunnery School was under the control of the Commanding General of the Army Air Forces Southeast Training Center, Maxwell Field, Alabama.
While at Chanute Field, the plaintiff received a letter from the Adjutant of the Army Air Forces Flexible Gunnery School sometime during the latter part of May 1943. This letter informed the plaintiff that his name had been submitted “for possible duty as Post Commander in an active theater,” and that information had been received to the effect that the plaintiff would be assigned to that type of duty.
Under the date of June 5, 1943, the War Department issued the following instructions to the Commanding General of the Army Air Forces Southeast Training Center concerning the issuance of orders to the plaintiff:
It is desired that you issue the necessary orders to relieve Major Marion G. Denton, 0-150432, Air Corps, from present assignment and duty, effective at such time as will enable him to comply with this order, and by direction of the President assign bim as Post Commander of the Greenland Base Command. He will proceed from his present station to Presque Isle, Maine, and report to the Commanding Officer, North Atlantic Wing, Air Transport Command, not later than 15 June 1943, for transportation by air to destination. Upon arrival at destination he will assume command.[3]
In accordance with the instructions referred to above, the Headquarters of the Army Air Forces Southeast Training Center issued under the date of June 8, 1943, for delivery to the plaintiff, orders which provided in part as follows:
Maj Marion G Denton 0150432 AC is reíd fr asgmt to BAAF Fort Myers Fla and by direction of the *850 President is asgd as Post Commander of the Greenland Base Command. He WP fr BAAF Fort Myers Fla to Presque Isle Maine reporting to the CO North Atlantic Wing Air Transport Command not later than June 15,1943 for T by air to destination. Upon arrival at destination he will assume command.[4]
In the early part of June 1943, the plaintiff completed the course of instruction at the Technical Inspectors’ School and left Chanute Field in order to return to his regular station at Buckingham Army Air Field. He made the trip via Maxwell Field, and stopped there for the purpose of obtaining any information that was available concerning his prospective new assignment. While at Maxwell Field, the plaintiff on June 9, 1943 received the orders mentioned in the preceding paragraph. He then proceeded to Buckingham Army Air Field, concluded his affairs at that post as soon as possible, and promptly departed for Presque Isle, Maine.
The War Department notified the Commanding Officer of the Greenland Base Command by radiogram that the two officers with pilots’ ratings whom he had requested earlier were en route to Greenland.[5]
The plaintiff arrived at the Presque Isle flying field of the Air Transport Command on June 16, 1943. He found that there was some uncertainty upon the part of the personnel at the field as to where he should be transported in accordance with the orders quoted above. The plaintiff was informed by personnel at the field that there were several posts in Greenland and his orders did not specify to which particular post he should go. After a period of delay, an officer in the Priorities & Traffic Office at the field told the plaintiff, “We now know where we are going to take you. The War Department wants you to go to BW-1.” The plaintiff was then given a trip ticket to BW-1.
On June 17, 1943, the plaintiff left Presque Isle on an airplane that was bound for BW-1. The plane landed at BW-1 at about 2 o’clock a. m. on June 18,1943.
*851 Upon, bis arrival at BW-1, tbe plaintiff was conducted oy the Officer of the Day to a building known as BOQ No. 9, where sleeping accommodations for transient officers were available. After obtaining from the Officer of the Day information concerning the location of the Post Headquarters, the plaintiff went to bed and slept for a while. Later in the morning, the plaintiff went to a building that had over it a sign reading “Post Headquarters, APO 858”. Upon entering the Post Headquarters building, the plaintiff met Major Lloyd, the Acting Post Commander. After a brief conversation, the plaintiff stated to Major Lloyd, “You probably know that I have come to assume command of the post.” Major Lloyd immediately said in reply, “Let’s go see the Colonel.”
The plaintiff followed Major Lloyd to another building, which had over it a sign reading, “Greenland Base Command”. The plaintiff was first introduced to a Captain Anderson, the Adjutant of the Greenland Base Command, and then to Colonel Wimsatt, the Commanding Officer of the Greenland Base Command. After some conversation, Colonel Wimsatt said with reference to the plaintiff’s orders that “It’s a crazy order,” that “It looks like an Air Corps order,” and that “There is no such thing as Post Commander of the Greenland Base Command.” Colonel Wimsatt then explained to the plaintiff that there were a number of posts in the Greenland Base Command, and that all of them, together with their commanders, were under his control as Commanding Officer of the Greenland Base Command. He told the plaintiff about his attempt to obtain from the War Department the services of an Air Corps major with a pilot’s rating to assume command of a post, BE-2, located some 500 miles to the northeast of the Base Command Headquarters, because it was expected that a flying field would be opened there in the summer of 1943; and he expressed his understanding that the plaintiff had been sent to the Greenland Base Command in response to such request. Colonel Wimsatt further stated, however, that engineering difficulties had been encountered at BE-2 in the meantime; that it was necessary to delay a final decision concerning the plaintiff’s assignment due to the uncertainty that then ex *852 isted relative to the opening of BE-2 as a flying field; and that the plaintiff would remain at the Headquarters of the Greenland Base Command pending a clarification of the situation.
During the course of the conversation mentioned in the preceding paragraph, the plaintiff told Colonel Wimsatt that he had been operating in Florida a private business involving the manufacture of smudge pots to keep frost from damaging citrus-fruit trees. The plaintiff expressed the view that his private business was making a considerable contribution to the war effort, and he indicated that he wanted to keep in as close communication with his business as he could. Colonel Wimsatt stated in reply that it would not be possible for the plaintiff to keep in close communication with his private business, as the mail service in Greenland was quite irregular and radio communication could only be used for official messages. The plaintiff appeared to be somewhat disconcerted on learning this.
Having heard nothing further from Colonel Wimsatt, the plaintiff sought and obtained an interview with Colonel Wimsatt on June 21, 1943. He told Colonel Wimsatt that he had been ordered to that destination to do something; that he had not yet done it; and that he wished to report to the War Department that he had not done what he was ordered to do. Colonel Wimsatt stated in reply that it was not necessary to make any report to the War Department concerning the matter.
On June 23, 1943, Colonel Wimsatt received a radiogram indicating that the Acting Post Commander of BE-2, Major Jensen,[6] urgently needed medical treatment at the Base Hospital, which was located at BW-1. Upon receiving this message, Colonel Wimsatt orally directed that an airplane be made ready to fly the plaintiff to BE-2[7] and return with Major Jensen to BW-1. Colonel Wimsatt also orally instructed his Adjutant, Captain Anderson, to inform the plaintiff that he should proceed on the airplane to BE-2 for the purpose of relieving Major Jensen and assuming *853 command. Captain Anderson, in turn, instructed the Assistant Adjutant, a Lieutenant Manley, to give the message to the plaintiff.
Lieutenant Manley encountered the plaintiff while the latter was on his way from the transient officers’ mess hall, where he had just eaten lunch, to BOQ No. 9. Lieutenant Manley told the plaintiff that “they” had been looking for him; that there was an airplane waiting for him; that the plaintiff should get his most essential baggage as soon as possible and board the airplane; and that the plaintiff’s other baggage would be sent to him later. The plaintiff informed Lieutenant Manley that he did not plan to go anywhere, and continued walking toward BOQ No. 9.
On the way to BOQ No. 9, the plaintiff encountered Captain Anderson, who excitedly told him, “Major, there’s an airplane waiting and we want you to get on it. We want you to go to No. 2.” The plaintiff stated in reply, “Well, Captain, there must be some mistake about this situation, because I have had an understanding with the Colonel that, before there was any duty that I was to undertake, we would have a conference.” The plaintiff continued walking toward BOQ No. 9 and, on arriving there, he seated himself in the dayroom of that building.
Soon after the plaintiff reached BOQ No. 9, Colonel Wim-satt and Captain Anderson entered the building. Colonel Wimsatt stated to the plaintiff that an emergency had arisen which required immediate action; that an airplane was then available and waiting to take the plaintiff to BE-2; and that the plaintiff was to proceed on the airplane to BE-2 and take command, relieving Major Jensen, who needed medical attention. The plaintiff, in reply, expressed his understanding that he and Colonel Wimsatt were going to have a further discussion before any final decision was made respecting his assignment. Colonel Wimsatt then said that BE-2 was the post for which the plaintiff had been requisitioned; and that during wartime it was necessary for personal convenience and preference to be subordinated to military needs. The plaintiff responded that he would prefer to be considered unfit for that duty. Colonel Wimsatt then told the plaintiff that the latter would either obey the *854 command and proceed to BE-2 on the waiting airplane, or Colonel Wimsatt was “going to try” tlie plaintiff. The plaintiff replied, “Then, sir, I suggest that you try me.”
Shortly after the incident in BOQ No. 9, Colonel Wimsatt, as the accuser, preferred charges against the plaintiff in the following language :
Charge: Violation of the 64th Article of War.
Specification: In that, Major Marion G. Denton, Air Corps, haying received a lawful command from Colonel Robert W. C. Wimsatt, Air Corps, his superior officer, to leave at once to assume command of Army Base APO #679, c/o Postmaster, New York, New York, did, at Army Base APO #858, c/o Postmaster, New York, New York, on or about June 23,1943, willfully disobey the same.
It was on these charges that the plaintiff was subsequently tried and convicted by a general court-martial and dismissed from the military service.
The plaintiff argues, in effect, that the orders transferring him to Greenland should be construed as providing that “Maj Marion G Denton * * * by direction of the President is asgd as Post Commander of [the post at which the headquarters of] the Greenland Base Command [are located] * * that as Colonel Wimsatt, the Commanding Officer of the Greenland Base Command, was subordinate to the President, Colonel Wimsatt could not countermand the President’s directive by assigning the plaintiff as Post Commander of BE-2; and, therefore, that the command which the plaintiff received from Colonel Wimsatt to proceed to BE-2 and assume command of that post was unlawful.
As the Greenland Base Command did not consist of a single post, but of 25 separate posts, the provision in the plaintiff’s orders stating that the plaintiff “by direction of the President is asgd as Post Commander of the Greenland Base Command” was ambiguous. Accordingly, when the plaintiff was told at the Presque Isle flying field, after a period of delay apparently caused by the ambiguity of the plaintiff’s orders, that “The War Department wants you to go to BW-1,” it was not unreasonable for the plaintiff to assume that the personnel at the flying field had requested a clarification by the War Department and had been informed *855 that tbe plaintiff was to be the Post Commander of BW-1.
Of course, in the light of all the evidence now available to the court, any communication from the War Department to the Presque Isle flying field indicating that the plaintiff was “to go to BW-1” merely confirmed the regular procedure whereby personnel destined for duty anywhere in the Greenland Base Command was transported first to BW-1 for processing through the Headquarters of the Greenland Base Command. However, the plaintiff was unaware of this procedure at the time, and he departed from Presque Isle and arrived at BW-1 under the impression that he was, “by direction of the President,” to assume command of BW-1 upon arriving at that post. The plaintiff’s actions in proceeding to the Post Headquarters at BW-1, and in informing the Acting Post Commander that “You probably know that I have come to assume command of the post,” were consistent with the plaintiff’s understanding at the time relative to the nature of his assignment.
However, when the plaintiff was taken by the Acting Post Commander of BW-1 to see the Commanding Officer of the Greenland Base Command and was given a full explanation by the latter respecting the organization of the Greenland Base Command, the existence of a number of separate posts in that command, and the history of the previous efforts made by the Commanding Officer of the Greenland Base Command to obtain from the War Department the services of an Air Corps major with a pilot’s rating to assume command of BE-2, it should then have been apparent to the plaintiff that his previous construction of the orders under which he had proceeded to Greenland was erroneous, and that such orders should more properly be construed as providing that “Maj Marion G Denton * * * by direction of the President is asgd as [a] Post Commander of the Greenland Base Command * * * .” Thus, when the Commanding Officer of the Greenland Base Command thereafter orally commanded the plaintiff to proceed to BE-2 and assume command of that post, there was then no reasonable basis for the plaintiff to believe that this oral command was unlawful or inconsistent with the orders transferring him to the Greenland Base Command.
*856 Furthermore, the plaintiff, as an Army officer for more than 24 years, should have realized that obedience to commands is the vital principle of military life, that a command issued by an officer of superior rank is presumptively lawful, and that, even though such a command may seem to be unlawful, the proper course to follow in a situation where obedience to the command would involve nothing more than inconvenience to the person receiving it is to obey the command and thereafter attempt to obtain redress from higher authority. Winthrop, Military Law and Precedents (2d ed., 1920 reprint), pp. 571, 576.
For the reasons discussed above, it appears that there was no valid justification, legal or otherwise, for the plaintiff’s refusal to obey Colonel Wimsatt’s oral command that he proceed to BE-2 and assume command of that post.
2. The Appointing Authority
One of the prerequisites to the exercise of jurisdiction by a court-martial is that it must have been appointed by an officer possessing the authority to do so. Swaim v. United States, 165 U. S. 553, 558-559 (1897). The plaintiff contends that this jurisdictional prerequisite was lacking in the court-martial case against him.
The Commanding Officer of the Greenland Base Command had the authority to appoint general courts-martial pursuant to Article of War 8 (41 Stat. 788). However, as Colonel Wimsatt, the Commanding Officer of the Greenland Base Command, was the accuser in the plaintiff’s case, he could not appoint a general court-martial for the trial of the plaintiff because of the provision in Article of War 8 to the effect that:
* * * when any such commander [with authority to appoint general courts-martial] is the accuser or the prosecutor of the person or persons to be tried, the court shall be appointed by superior competent authority * * *.
Hence, it was necessary that the general court-martial for the trial of the plaintiff’s case be appointed by someone who, in relation to Colonel Wimsatt, was a “superior competent authority”.
*857 As the Greenland Base Command was an independent oversea command, the chain of command ran upward from the Commanding Officer of the Greenland Base Command to the Secretary of War, and then to the President as Commander-in-Chief of the Army and Navy. In the chain of command above the Commanding Officer of the Greenland Base Command, only the President was authorized by Article of War 8 to appoint general courts-martial.
Colonel Wimsatt forwarded the charges against the plaintiff to the War Department. The Secretary of War customarily acted through the Operations Division of the War Department General Staff in exercising control over independent oversea commands, such as the Greenland Base Command. After the advice of the Judge Advocate General of the Army had been obtained, the Operations Division of the War Department General Staff took the following action “By order of the Secretary of War” with respect to the charges against the plaintiff:
The Judge Advocate General is hereby authorized and directed to call upon The Adjutant General to issue such orders as are required to effect the removal of the accused, Major Marion G. Denton, 0-150432, A. C., together with witnesses and all other persons.or evidence required from Greenland or any other point to a Command within the United States having authority to convene general courts martial. In this connection, it is recommended that consideration be given to the feasibility of using the facilities of the Headquarters, First Air Force at Mitchel Field, New York.
In accordance with the directions quoted in the preceding paragraph, steps were taken whereby the plaintiff was transferred from the Greenland Base Command, and the charges against the plaintiff were forwarded from the War Department, to the Headquarters of the First Air Force at Mitchel Field, New York.
The Commanding General of the First Air Force was empowered to appoint general courts-martial pursuant to Article of War 8. On August 24, 1943, a general court-martial was appointed by Major General Ralph Royce, the Commanding General of the First Air Force. Two days later, the charges against the plaintiff were referred by the *858 Commanding General of the First Air Force to the trial judge advocate of the general court-martial for trial. The trial of the plaintiff before the general court-martial was held on September 27 and 28,1948. As previously indicated, the trial ended in the conviction and sentencing of the plaintiff.
The plaintiff argues that since Colonel Wimsatt, the Commanding Officer of the Greenland Base Command, was the accuser in his case, a general court-martial for his trial could only be appointed under Article of War 8 by “superior competent authority” in the chain of command above the Commanding Officer of the Greenland Base Command, which necessarily restricted the power of appointment -to the President.
Prior to July 1, 1913, the appointment of general courts-martial was governed by “old” Articles of War 72 and 73, which provided as follows:
ART. 72. Any general officer commanding an army, a Territorial Division or a Department, or colonel commanding a separate Department may appoint general courts martial whenever necessary. But when any such commander is the accuser or prosecutor of cmy officer under his command the court shall he appointed by the President; and its proceedings and sentence shall be sent directly to the Secretary of War, by whom they shall be laid before the President, for his approval or orders in the case. [23 Stat. 121; italics supplied.]
Art. 73. In time of war the commander of a division, or of a separate brigade of troops, shall be competent to appoint a general court-martial. But when such commander is the accuser or prosecutor of any person under his command, the court shall be appointed by the next higher commander. [Rev. Stat. (2d ed., 1878), p. 237; italics supplied.]
Thus, it will be seen that the “old ’’Articles of War 72 and 73 used specific language which made it plain that when an officer with authority to appoint general courts-martial was himself the accuser or prosecutor in a case, the general court-martial for the trial of the accused could only be appointed by higher authority in the chain of command above the accuser or prosecutor. The appointing power was expressly restricted to the President (i. e., the Commander-in- *859 Chief) in numerous situations of that sort. In other situations, the court could be appointed by “the next higher commander” above the accuser or prosecutor.
As of July 1, 1913, the provisions of the Articles of War governing the appointment of general courts-martial were revised by the Act of March 2, 1913 (37 Stat. 704, 722) to read in pertinent part as follows:
The President of the United States, the commanding officer of a territorial division or department, the Superintendent of the Military Academy, the commanding officer of an army, a field army, an army corps, a division, or a separate brigade, and when empowered by the President, the commanding officer of any district or of any force or body of troops, may appoint general courts-martial whenever necessary; but when any such commander is the accuser or the prosecutor of the person or persons to he tried the court shall he appointed hy superior competent authority * * * . [Italics supplied.]
The language quoted above became the “new” Article of War 8 in the 1920 revision and reenactment of the Articles of War (except for the omission of “a field army” and “whenever necessary”, and minor variations in punctuation).
The legislative history of the statutory change discussed in the preceding paragraph does not throw any light on the purpose of Congress in revising the law with respect to the appointment of a general court-martial for the trial of an accused on charges preferred or prosecuted by an officer with authority to appoint general courts-martial. Hence, consideration must be limited to a comparison of the “old” and the “new” statutory language on this point.
When the language of the 1913 revision is contrasted with the language of the “old” Articles of War 72 and 73, it appears that the 1913 change in the law permitted greater flexibility than had previously been possible in dealing with a situation where an officer with authority to appoint general courts-martial was himself the accuser or prosecutor in a case. Since the Congress, in framing the language of the 1913 revision, omitted any phraseology indicating that the concept of the chain of command was incorporated into the term “superior competent authority”, I do not believe that this court would be justified in imposing such a limitation *860 through the process of interpretation. On the contrary, it is my opinion that this term should be interpreted to mean any “superior competent authority”.
In the military service, a person is the “superior” of another person if he has either superiority in command or superiority in rank. Winthrop, Military Law and Precedents (2d ed., 1920 reprint), p. 570; Manual for Courts-Martial (1928 ed., corrected to April 20, 1948), pars. 133, 134; Art. 1 (6), Uniform Code of Military Justice (64 Stat. 108). Major General Eoyce, who appointed the general court-martial for the trial of the plaintiff, was obviously “superior” in rank to Colonel Wimsatt, the accuser in the plaintiff’s case. Furthermore, General Eoyce was a “competent authority”, since he was empowered, as the Commanding General of the First Air Force, to appoint general courts-martial.
Therefore, it is my opinion that the general court-martial which tried, convicted, and sentenced the plaintiff was appointed by “superior competent authority”, within the meaning of that phrase as used in Article of War 8.
3. The Assistance of Counsel
The plaintiff contends that he was denied the assistance of counsel in connection with his court-martial trial. This contention is based upon the circumstances that:
(a) the defense counsel of the general court-martial that convicted and sentenced him was not a licensed attorney; and
(b) the Army failed to assign as the plaintiff’s individual defense counsel an officer whose services the plaintiff requested and who (according to the plaintiff) was reasonably available to serve in that capacity.
Shortly after the court-martial charges were preferred against the plaintiff, and while he was still in Greenland, the plaintiff wrote a letter to Captain John Conway Cook, a member of the Judge Advocate General’s Department of the Army and a graduate of the Judge Advocate General’s School. Captain Cook was then serving as Assistant Staff Judge Advocate of the Army Air Forces Southeast Training Center at Maxwell Field, Alabama. The plaintiff had *861 met Captain Cook in June 1942, when they were both stationed at the Buckingham Army Air Field, and he had confidence in Captain Cook’s ability and integrity. Prior to World War II, Captain Cook had been a civilian attorney practicing in the State of Michigan, where he was admitted to the bar in 1928.
The letter mentioned in the preceding paragraph informed Captain Cook of the charges that had been preferred against the plaintiff, and stated that the plaintiff wanted Captain Cook to defend him when the trial was held. Captain Cook replied immediately, and said that he would be honored to try to help the plaintiff. Thereafter, correspondence concerning the plaintiff’s case was exchanged regularly between the plaintiff and Captain Cook each week, and sometimes more often, until the plaintiff’s trial was held.
In the order appointing the general court-martial for the trial of the plaintiff’s case, the Commanding General of the First Air Force designated Lieutenant Colonel Gregory F. Keenan, of the Air Corps, as defense counsel, and Captain Adolph J. Eckhardt, of the Quartermaster Corps, as assistant defense counsel. Lieutenant Colonel Keenan was not a licensed attorney. Captain Eckhardt had been a civilian attorney practicing in the State of New York prior to World War II. He began the practice of law in 1989. During his military service, Captain Eckhardt, although not a member of the Judge Advocate General’s Department, had been detailed to try many cases before courts-martial.
On August 27, 1943, the day after the charges against the plaintiff were referred to the trial judge advocate of the general court-martial for trial, Lieutenant Colonel Keenan submitted to the Commanding General of the First Air Force, on the plaintiff’s behalf, a formal request that arrangements be made for Captain John Conway Cook to be ordered to Mitchel Field on temporary duty in order to act as the plaintiff’s individual defense counsel, pursuant to Article of War 17 (41 Stat. 790).
At about the time of the submission of the formal request for the services of Captain John Conway Cook as the plaintiff’s individual defense counsel, Lieutenant Colonel Keenan conferred with the Staff Judge Advocate of the First Air *862 Force and stated that he would like to be relieved as defense counsel of the court-martial. He explained that since he was not a lawyer, he did not regard himself as qualified to handle the plaintiff’s case, which involved the possibility of a death sentence. The Staff Judge Advocate stated in reply that he considered Lieutenant Colonel Keenan to be as well qualified as any other officer at the First Air Force Headquarters; that no one else was available to take his place; and that he would have to continue with the case.
The plaintiff’s request for the services of Captain John Conway Cook as his individual defense counsel was forwarded through the Office of the Judge Advocate General of the Army to the Headquarters of the Army Air Forces Southeast Training Center at Maxwell Field. That Headquarters informed the Office of the Judge Advocate General of the Army, which in turn informed the Commanding General of the First Air Force in a communication dated September 14, 1948, that it was expected that Captain Cook would be available on September 20,1943 to act as the plaintiff’s individual defense counsel, but that his appearance at Mitchel Field on that date could not be guaranteed. The communication from the Office of the Judge Advocate General to the Commanding General of the First Air Force further stated that:
* * * Under these circumstances it is believed this situation should be explained in writing to military defense counsel appointed to defend Major Denton who should likewise be advised that the trial will be held 23 September 1943 whether or not Captain Cook can arrange to be present assuming this is agreeable to your Headquarters.
Upon the receipt by the First Air Force Headquarters of the communication from the Office of the Judge Advocate General of the Army mentioned in the preceding paragraph, the plaintiff’s trial by court-martial was scheduled for September 23, 1943. Shortly after the trial date was fixed, however, information was received at Mitchel Field to the effect that Captain Cook would not be able to leave Maxwell Field until September 24,1943. Lieutenant Colonel Keenan, the defense counsel, thereupon submitted to the Commanding General of the First Air Force a request that the plain *863 tiff’s trial by court-martial be postponed from September 23 to September 30,1943. As a result of that request, the plaintiff’s trial was reset for September 27,1943.
On or about September 20, 1943, the plaintiff was informed by the Headquarters of the First Air Force in writing that “This headquarters has been advised by the War Department that Captain John C. Cook, requested by you as individual defense counsel, will not be available for that purpose.”
After receiving information regarding Captain John Conway Cook’s unavailability, the plaintiff, on September 21, 1943, submitted to the Headquarters of the First Air Force a request that Lieutenant Colonel Donald B. Brummel, Air Corps, be detailed as the plaintiff’s individual defense counsel. This request was granted. Lieutenant Colonel Brummel’s qualifications are not shown by the evidence.
As previously indicated, the trial of the plaintiff before the general court-martial was held on September 27 and 28, 1943. The conduct of the trial for the defense was handled principally by Captain Adolph J. Eckhardt, assistant defense counsel. However, Lieutenant Colonel Gregory F. Keenan, defense counsel, participated actively in the proceedings. Lieutenant Colonel Donald B. Brummel, the plaintiff’s individual defense counsel, was present at the trial but did not take an active part in it.
The Sixth Amendment to the Constitution provides in part as follows:
In all criminal prosecutions, the accused shall enjoy the right * * * to have the assistance of counsel for his defence.
The constitutional provision quoted above applies to persons involved in prosecutions before courts-martial as well as to persons involved in prosecutions before Federal civil courts. Shapiro v. United States, 107 C. Cls. 650, 653 (1947).
In the ordinary case, this constitutional right is satisfied if an accused is afforded a reasonable opportunity to retain counsel and his counsel (if retained) is permitted to represent and assist him. Sanford v. Robbins, 115 F. 2d 435, 438 (C. A. 5, 1940), cert. denied 312 U. S. 697. The Constitution does not require that counsel be provided for *864 an accused (Sanford v. Robbins, supra, at p. 438), except in a situation where the accused is unable to employ counsel and is incapable of making his own defense adequately because of ignorance, feeble-mindedness, illiteracy, or some similar reason (Powell v. Alabama, 287 U. S. 45, 71 (1932)).
In the present litigation, there has been no showing that the plaintiff was unable to employ counsel and incapable of making his own defense adequately in the court-martial proceedings. Hence, there apparently would be no basis for a holding that the plaintiff was denied his constitutional right to the assistance of counsel, even if counsel had not been provided for the plaintiff by the Army. However, the Army actually provided counsel for the plaintiff in the persons of Lieutenant Colonel Gregory F. Keenan, Captain Adolph J. Eckhardt, and Lieutenant Colonel Donald B. Brummel; and Lieutenant Colonel Keenan and Captain Eckhardt were very active in defending the plaintiff. It is true that Lieutenant Colonel Keenan was not a licensed attorney,[8] but Captain Eckhardt, who took the leading role in the conduct of the plaintiff’s defense, was a licensed attorney with extensive experience in the trial of court-martial cases. Moreover, the plaintiff has not pointed out any instance of dereliction of duty upon the part of Lieutenant Colonel Keenan or any instance wherein Lieutenant Colonel Keenan demonstrated a lack of reasonable competence, to the prejudice of the substantial rights of the plaintiff. In this connection, see Romero v. Squier, 133 F. 2d 528, 531-532 (C. A. 9, 1943), cert. denied 318 U. S. 785; Altmayer v. Sanford, 148 F. 2d 161, 162 (C. A. 5, 1945).
With respect to the failure of the Army to assign Captain John Conway Cook to serve as the plaintiff’s individual defense counsel, it should be noted that Article of War 17 (41 Stat. 790) went beyond the minimum requirements of the Constitution respecting the right to the assistance of counsel and provided in part as follows:
* * * The accused shall have the right to be represented in his defense before the court by counsel of his own selection, civil counsel if he so provides, or military if *865 such counsel Toe reasonably available, otherwise by the defense counsel duly appointed for the court pursuant to article 11. * * * [Italics supplied.]
The authority to decide whether Captain John Conway Cook was “reasonably available” to serve as the plaintiff’s individual defense counsel was vested in the Commanding General of the Army Air Forces Southeast Training Center as the officer authorized to make the detail and order any necessary travel. Manual for Courts-Martial’ (1928 ed., corrected to April 20, 1943), par. 45-a. Since official action is supported by a presumption of regularity (United States v. Chemical Foundation, 272 U. S. 1, 14-15 (1926)), and any official action is presumed, in the absence of evidence indicating otherwise, to have been taken by the officer vested with the authority to act (United States v. Page, 137 U. S. 673, 679-680 (1891)), it must be inferred in the present case that the information from the War Department to the First Air Force Headquarters relative to the unavailability of Captain Cook was based upon a determination by the Commanding General of the Army Air Forces Southeast Training Center that, notwithstanding the previous indication of willingness to make Captain Cook’s services available to the plaintiff, Captain Cook would not be released temporarily from his regular duties in order that he might act as individual defense counsel for the plaintiff.
The evidence does not show the specific reason or reasons why the Commanding General of the Army Air Forces Southeast Training Center ultimately decided that Captain Cook would not be temporarily relieved of his regular duties in order that he might serve as the plaintiff’s individual defense counsel. However, the evidence does indicate that Captain Cook was occupied in the performance of his regular duties at Maxwell Field during the period of the plaintiff’s court-martial trial. Consequently, it cannot be held that the final decision against detailing him temporarily to the duty of serving as the plaintiff’s individual defense counsel at Mitchel Field was arbitrary or capricious.
In the absence of evidence showing that the Commanding General of the Army Air Forces Southeast Training Center exercised his discretionary power in an arbitrary or capri *866 cious manner when he finally determined that Captain Cook was not “reasonably available” for an assignment to serve as the plaintiff’s individual defense counsel, the plaintiff cannot assert a valid claim, legal or equitable, by virtue of the failure to provide him with the services of Captain Cook. Cf. Hiatt v. Brown, 339 U. S. 103, 108-109 (1950); Whelchel v. McDonald, 340 U. S. 122, 126 (1950).
I therefore recommend to the court that plaintiff’s petition in case No. 49800 be dismissed, and that with respect to Cong. No. 6-58 it be reported to the Congress that plaintiff has neither an equitable nor legal claim against the United States.
FINDINGS OF FACT
L The plaintiff is a citizen of the United States and a resident of Auburndale, Florida.
2. (a) On January 18, 1918, the plaintiff enlisted in the Aviation Signal Enlisted Reserve Corps of the Army for training as a military pilot. He was called to active military duty as a flying cadet in March 1918. Upon completing the course of training as a flying cadet and securing a rating as a military pilot, the plaintiff on May 16, 1919 was commissioned as a second lieutenant in the Air Corps Reserve, Officers’ Reserve Corps. The extended period of active military duty that began in March 1918 ended honorably on August 15, 1919.
(b) The plaintiff thereafter retained his commission as a Reserve officer of the Army, and from time to time he served on active military duty. His active military service during the period between August 16, 1919 and July 31, 1941 totaled more than 1% years. As a result of promotions, he was a major in 1941.
(c) Effective August 1,1941, the plaintiff was ordered to, and entered upon, an extended tour of active duty in the Army as a major, Air Corps Reserve. He thereafter served continuously on such duty until August 19, 1944. During this period of service, the plaintiff was rated as a military pilot, but he was not in a flying status.
3. (a) In 1943, there was in existence as part of the United States military establishment an independent oversea command known as the Greenland Base Command. The Green *867 land Base Command consisted of all the United States military installations located within the territorial limits of Greenland. These installations included three principal posts or stations and 22 smaller posts or stations.
(b) One of the major posts of the Greenland Base Command was located in the southern part of Greenland.. It included the largest flying field in Greenland, with appurtenant service facilities and personnel, and also protective forces. This post had the code name of Bluie West 1, or BW-1, and the Army post-office address of APO 858.
(c) Another major post of the Greenland Base Command was located on the east coast of Greenland, approximately 500 miles to the northeast of, and across the icecap from, BW-1. This post had the code name of Bluie East 2, or BE-2, and the Army post-office address of APO 679. The construction of a large flying field at BE-2 had been begun in the fall of 1942, and the construction work was still in progress during the first half of 1943, although the runway was partially open in June 1943.
(d) The third major post of the Greenland Base Command consisted of a large flying field on the west coast of Greenland. This post had the code name of Bluie West 8, or BW-8.
(e) The 22 smaller posts of the Greenland Base Command were mainly weather stations located on the fringe of Greenland for the purpose of evaluating and transmitting weather information.
4. (a) Each post or station of the Greenland Base Command had a post commander. He exercised command over the post, over the activities conducted there, and over the personnel assigned or attached to the post.
(b) The Commanding Officer of the Greenland Base Command was in general command of the entire area, of all posts or stations located within the area, and of all operations, whether tactical or logistical, in the area.
(c) The chain of command ran upward from a post commander of the Greenland Base Command to the Commanding Officer of the Greenland Base Command, then to the Secretary of War, and then to the President as Commander-in-Chief of the Army and Navy. The Secretary of War *868 customarily acted through, the Operations Division of the War Department General Staff in exercising control over independent oversea commands, such as the Greenland Base Command.
5. (a) The Commanding Officer of the Greenland Base Command had the authority to appoint general courts-martial pursuant to Article of War 8 (41 Stat. 788).
(b) In the chain of command above the Commanding Officer of the Greenland Base Command, only the President had the authority to appoint general courts-martial.
6. The Commanding Officer of the Greenland Base Command maintained his headquarters at BW-1. Hence, there were two separate headquarters maintained at BW-1, i. e., the Post Headquarters and the Headquarters of the Greenland Base Command.
7. Personnel transferred from another command to the Greenland Base Command for service in the latter was transported to BW-1 in the first instance and, if destined for service at some other post, was then sent to such post after being processed through the Headquarters of the Greenland Base Command.
8. (a) During the early part of 1948, the Commanding Officer of the Greenland Base Command was Colonel Bobert W. C. Wimsatt; the Acting Post Commander of BW-1 was a Major Lloyd; and the Acting Post Commander of BE-2 was a Captain Jensen.
(b) Major Lloyd and Captain Jensen only had the status of acting post commanders because they were not rated as military pilots and it was the policy of the War Department for flying fields to be commanded by officers with pilots’ ratings, if reasonably available.
9. In January 1948, Colonel Wimsatt, the Commanding Officer of the Greenland Base Command, informed the War Department that he needed the services of two Air Corps officers with pilots’ ratings, one in the grade of major and one in the grade of lieutenant colonel, to serve as post commanders of flying fields in the Greenland Base Command. In requesting these officers, it was Colonel Wimsatt’s intention that the major should replace Captain Jensen as the Post Commander of BE-2 and that the lieutenant colonel *869 should replace Major Lloyd as the Post Commander of BW-1.
10. As the War Department did not, for a period of some months, furnish to the Greenland Base Command any officers possessing the qualifications referred to in finding 9, the Commanding Officer of the Greenland Base Command addressed several follow-up inquiries to the War Department. He was anxious to obtain the two officers as soon as possible, since the flying field at BW-1 was already in operation and it was anticipated that the flying field at BE-2 would be operational by the summer of 1943.
11. (a) As of May 1943, the plaintiff was regularly assigned to the Army Air Forces Flexible Gunnery School at Buckingham Army Air Field, Fort Myers, Florida, but he was on temporary duty at Chanute Field, Bantoul, Illinois, for the purpose of attending the Technical Inspectors’ School there. The Army Air Forces Flexible Gunnery School was under the control of the Commanding General of the Army Air Forces Southeast Training Center, Maxwell Field, Alabama.
(b) While at Chanute Field, the plaintiff received a letter from the Adjutant of the Army Air Forces Flexible Gunnery School sometime during the latter part of May 1943. This letter informed the plaintiff that his name had been submitted “for possible duty as Post Commander in an active theater,” and that information had been received to the effect that the plaintiff would be assigned to that type of duty.
12. Under the date of June 5, 1943, the War Department issued the following instructions to the Commanding General of the Army Air Forces Southeast Training Center concerning the issuance of orders to the plaintiff:
It is desired that you issue the necessary orders to relieve Major Marion G. Denton, 0-150432, Air Corps, from present assignment and duty, effective at such time as will enable him to comply with this order, and by direction of the President assign him as Post Commander of the Greenland Base Command. He will proceed from his present station to Presque Isle, Maine, and report to the Commanding Officer, North Atlantic Wing, Air Transport Command, not later than 15 June *870 1943, for transportation by air to destination. Upon arrival at destination he will assume command.
13. In accordance with the instructions referred to in finding 12, the Headquarters of the Army Air Forces Southeast Training Center issued under the date of June 8, 1943, for delivery to the plaintiff, orders which provided in part as follows:
Maj Marion G Denton 0150432 AC is reíd fr asgmt to BAAF Fort Myers Fla and by direction of the President is asgd as Post Commander of the Greenland Base Command. He WP fr BAAF Fort Myers Fla to Presque Isle Maine reporting to the CO North Atlantic Wing Air Transport Command not later than June 15, 1943 for T by air to destination. Upon arrival at destination he will assume command.
14. In the early part of June 1943, the plaintiff completed the course of instruction at the Technical Inspectors’ School and left Chanute Field in order to return to his regular station at Buckingham Army Air Field. He made the trip via Maxwell Field, and stopped there for the purpose of obtaining any information that was available concerning his prospective new assignment. While at Maxwell Field, the plaintiff on June 9,1943 received the orders mentioned in finding 13. He then proceeded to Buckingham Army Air Field, concluded his affairs at that post as soon as possible, and promptly departed for Presque Isle, Mame.
15. The War Department notified the Commanding Officer of the Greenland Base Command by radiogram that the two officers with pilots’ ratings whom he had requested earlier were en route to the Greenland Base Command.
16. The plaintiff arrived at the Presque Isle flying field of the Air Transport Command on June 16,1943. He found that there was some uncertainty upon the part of the personnel at the field as to where he should be transported in accordance with the orders quoted in finding 13. The plaintiff was informed by personnel at the field that there were several posts in Greenland and his orders did not specify to which particular post he should go. After a period of delay, an officer in the Priorities & Traffic Office told the plaintiff, “We now know where we are going to take you. *871 The War Department wants you to go to BW-1.” The plaintiff was then given a trip ticket to BW-1.
17. On June 17, 1943, the plaintiff left Presque Isle on an airplane that was bound for BW-1. The plane landed at BW-1 at about 2 o’clock a. m. on June 18,1943.
18. Upon his arrival at BW-1, the plaintiff was conducted by the Officer of the Day to a building known as BOQ No. 9, where sleeping accommodations for transient officers were available. After obtaining from the Officer of the Day information concerning the location of the Post Headquarters, the plaintiff went to bed and slept for a time. Later in the morning, the plaintiff went to a building that had over it a sign reading, “Post Headquarters, APO 858”. Upon entering the Post Headquarters building, the plaintiff met Major Lloyd, the Acting Post Commander. After a brief conversation, the plaintiff stated to Major Lloyd, “You probably know that I have come to assume command of the post.” Major Lloyd immediately said in reply, “Let’s go see the Colonel.”
19. (a) The plaintiff followed Major Lloyd to another building, which had over it a sign reading, “Greenland Base Command”. The plaintiff and Major Lloyd first went into the office of the Adjutant of the Greenland Base Command, and the plaintiff was introduced to the Adjutant, a Captain Anderson. Major Lloyd and Captain Anderson disappeared into another office, closing the door behind them. After a lapse of time, Captain Anderson came out and asked the plaintiff for a copy of his orders. The plaintiff handed a copy of the orders to Captain Anderson, who again disappeared into the other office. After another interval, the plaintiff was conducted into the other office previously mentioned, and there he was introduced to Colonel Wim-satt, the Commanding Officer of the Greenland Base Command. After some conversation, Colonel Wimsatt said with reference to the plaintiff’s orders that “It’s a crazy order,” that “It looks like an Air Corps order,” and that “There is no such thing as Post Commander of the Greenland Base Command.” Colonel Wimsatt then explained to the plaintiff that there were a number of posts in the Greenland Base Command, and that all of them, together with their com *872 manders, were under his control as Commanding Officer of the Greenland Base Command. He told the plaintiff about his attempt to obtain from the War Department the services of an Air Corps major with a pilot’s rating to assume command of a post, BE-2, located some 500 miles to the northeast of the Base Command Headquarters, because it was expected that a flying field would be opened there in the summer of 1943; and he expressed his understanding that the plaintiff had been sent to the Greenland Base Command in response to such request. Colonel Wim-satt further stated, however, that engineering difficulties had been encountered at BE-2 in the meantime; that it was necessary to delay a final decision concerning the plaintiff’s assignment due to the uncertainty that then existed relative to the opening of BE-2 as a flying field; and that the plaintiff would remain at the Headquarters of the Greenland Base Command pending a clarification of the situation.
(b) During the course of the conversation mentioned in paragraph (a) of this finding, the plaintiff told Colonel Wimsatt that he had been operating in Florida a private business involving the manufacture of smudge pots to keep frost from damaging citrus-fruit trees. The plaintiff expressed the view that his private business was making a considerable contribution to the war effort, and he indicated that he wanted to keep in as close communication with his business as he could. Colonel Wimsatt stated in reply that it would not be possible for the plaintiff to keep in close communication with his private business, as the mail service in Greenland was quite irregular and radio communication could only be used for official messages. The plaintiff appeared to be somewhat disconcerted on learning this.
20. Shortly after the conversation between the plaintiff and Colonel Wimsatt mentioned in finding 19, Colonel Wim-satt orally instructed Captain Anderson, Adjutant of the Greenland Base Command, that the plaintiff should be attached to the Base Headquarters and Headquarters Company for administration and record-keeping purposes pending a final decision regarding his future assignment.
21. Having heard nothing further from Colonel Wimsatt, the plaintiff on the morning of June 21,1943 presented him *873 self to Captain Anderson and requested an interview with Colonel Wimsatt. Captain Anderson informed the plaintiff that Colonel Wimsatt was not available at that time but would be available in the afternoon. The plaintiff returned in the afternoon of June 21 and was taken into Colonel Wimsatt’s office. He told Colonel Wimsatt that he had been ordered to that destination to do something; that he had not yet done it; and that he wished to report to the War Department that he had not done what he was ordered to do. Colonel Wimsatt stated in reply that it was not necessary to make any report to the War Department concerning the matter.
22. (a) On June 23,1943, Colonel Wimsatt received a radiogram indicating that the Acting Post Commander of BE-2, Major Jensen (he had been promoted from captain to major subsequent to the time mentioned in finding 8), urgently needed medical treatment at the Base Hospital, which was located at BW-1. Upon receiving this message, Colonel Wimsatt orally directed that an airplane be made ready to fly the plaintiff to BE-2 and return with Major Jensen to BW-1. Colonel Wimsatt also orally instructed his Adjutant, Captain Anderson, to inform the plaintiff that he should proceed on the airplane to BE-2 for the purpose of relieving Major Jensen and assuming command. Captain Anderson, in turn, instructed the Assistant Adjutant, a Lieutenant Manley, to give the message to the plaintiff.
(b) Lieutenant Manley encountered the plaintiff while the latter was on his way from the transient officers’ mess hall, where he had just eaten lunch, to BOQ No. 9. Lieutenant Manley told the plaintiff that “they” had been looking for him; that there was an airplane waiting for him; that the plaintiff should get his most essential baggage as soon as possible and board the airplane; and that the plaintiff’s other baggage would be sent to him later. The plaintiff informed Lieutenant Manley that he did not plan to go anywhere, and continued walking toward BOQ No. 9.
(c) On the way to BOQ No. 9, the plaintiff encountered Captain Anderson, who excitedly told him, “Major, there’s an airplane waiting and we want you to get on it. We want you to go to No. 2.” The plaintiff stated in reply, “Well, *874 Captain, there must be some mistake about this situation, because I have had an understanding with the Colonel that, before there was any duty that I was to undertake, we would have a conference.” The plaintiff continued toward BOQ No. 9 and, on arriving there, he seated himself in the day-room of that building.
(d) Soon after the plaintiff reached BOQ No. 9, Colonel Wimsatt and Captain Anderson entered the building. Colonel Wimsatt stated to the plaintiff that an emergency had arisen which required immediate action; that an airplane was then available and waiting to take the plaintiff to BE-2; and that the plaintiff was to proceed on the airplane to BE-2 and take command of that post, relieving Major Jensen, who needed medical attention. The plaintiff, in reply, expressed his understanding that he and Colonel Wimsatt were going to have a further discussion before any final decision was made respecting his assignment. Colonel Wim-satt then said that BE-2 was the post for which the plaintiff had been requisitioned; and that during wartime it was necessary for personal convenience and preference to be subordinated to military needs. The plaintiff responded that he would prefer to be considered unfit for that duty. Colonel Wimsatt then told the plaintiff that the latter would either obey the command and proceed to BE-2 on the waiting airplane, or “I am going to try you.” The plaintiff replied, “Then, sir, I suggest that you try me.”
23. (a) Shortly after the events referred to in finding 22, Colonel Wimsatt, as the accuser, signed and swore to charges against the plaintiff; he placed the plaintiff in arrest; and he caused certain written orders respecting the plaintiff to be issued by the Headquarters of the Greenland Base Command. These actions were taken during the afternoon of June 23, 1943.
(b) The charges that Colonel Wimsatt preferred against the plaintiff were phrased in the following language:
Charge: Violation of the 64th Article of War.
Specification: In that, Major Marion G. Denton, Air Corps, having received a lawful command from Colonel Bobert W. C. Wimsatt, Air Corps, his superior officer, to leave at once to assume command of Army Base APO #679, c/o Postmaster, New York, New *875 York, did, at Army Base, APO #858, c/o Postmaster, New York, New York, on or about June 28, 1943, willfully disobey the same.
(c) Upon being placed in arrest, the plaintiff was restricted to the limits of BOQ No. 9, the transient officers’ mess hall, and the latrine.
(d) The orders mentioned in paragraph (a) of this finding provided as follows:
1. Major Marion G. Denton,0150432, Air Corps, having reported for duty with this Command 18 June 1943 pursuant to Paragraph 3, classified Special Orders 156, Headquarters Army Air Forces Southeast Training Center, Maxwell Field, Alabama, dated 8 June 1943, is hereby relieved from attached to Headquarters and Headquarters Company Base Command, APO 858, c/o Postmaster, New York, N. Y., and assigned to Army Base, APO 679, c/o Postmaster, New York, N. Y., and will proceed thereto by first available air transportation. Upon arrival Major Denton will assume command of Army Base, APO 679, c/o Postmaster, New York, N. Y., relieving the present commanding officer Major Carl C. Jensen, 0306039, Infantry. Transfer of funds and property, etc., will be accomplished according to appropriate Army [Regulations.
* * * * *
3. VOCO of 19 June 1943 attaching Major Marion G. Denton, 0150432, AC, to Base Hq & Hq Co, APO 858 NYC, for administration is hereby confirmed and made of record.
Copies of the orders quoted’ above were furnished to the plaintiff on June 24,1943.
24. On June 25, 1943, Colonel Wimsatt transmitted to the War Department a radio communication stating as follows:
Am personally preferring General Court Martial charges under 64 Article of War (Operations Divn WDGS sig Wimsatt) against Major Mirion [sic] G. Denton 0150432 Air Corps. This officer has permanent grade Major, therefore cannot appoint General Court under provisions par 4C, MCM1928 and Article of War number 8. Only 2 officers this command with enough rank to sit on court. In this case appointing authority is the accuser, therefore request a General Court be appointed and sent this command as General Court in sub *876 ject trial. Accused being held under arrest pending trial.
25. When the communication mentioned in finding 24 was received at the War Department, it was referred to the Office of the Judge Advocate General of the Army for consideration and advice. On June 26, 1943, the Office of the Judge Advocate General suggested that the plaintiff’s case should be forwarded to the Commanding General of the First Air Force at Mitchel Field, New York, for trial by a general court-martial.
26. Colonel Wimsatt was directed by the War Department to forward the charges against the plaintiff to the Department, and he did so.
27. (a) Sometime after his arrest and prior to the end of June 1943, the plaintiff wrote a letter to Captain John Conway Cook, a member of the Judge Advocate General’s Department of the Army and a graduate of the Judge Advocate General’s School. Captain Cook was then serving as Assistant Staff Judge Advocate of the Army Air Forces Southeast Training Center at Maxwell Field. The plaintiff had met Captain Cook in June 1942, when they were both stationed at the Buckingham Army Air Field, and he had confidence in Captain Cook’s ability and integrity. Prior to World War II, Captain Cook had been a civilian attorney practicing in the State of Michigan, where he was admitted to the bar in 1928.
(b) The letter mentioned in paragraph (a) of this finding informed Captain Cook of the charges that had been preferred against the plaintiff, and stated that the plaintiff wanted Captain Cook to defend him when the trial was held. Captain Cook replied immediately, and said that he would be honored to try to help the plaintiff. Thereafter, correspondence concerning the plaintiff’s case was exchanged regularly between the plaintiff and Captain Cook each week, and sometimes more often, until the plaintiff’s trial was held.
28.. The instructions (see finding 12) pursuant to which the plaintiff had been ordered to Greenland were amended by the War Department on July 8, 1943 to read as follows:
It is desired that you issue the necessary orders to relieve Major Marion G. Denton, 0-150432, Air Corps, *877 from bis present assignment and duty, effective at such time as will enable him to comply with this order, and assign him to the Greenland Base Command. He will proceed from his present station to Presque Isle, Maine, and report to the Commanding Officer, North Atlantic Wing, Air Transport Command, not later than 15 June 1948, for transportation by air to destination. Upon arrival, at destination he will report to the Base Commander for duty.
29. (a) By means of a communication dated July 26,1943 and signed “By order of the Secretary of War,” the Operations Division of the War Department General Staff took the following action with respect to the charges against the plaintiff:
The Judge Advocate General is hereby authorized and directed to call upon The Adjutant General to issue such orders as are required to effect the removal of the accused, Major Marion G. Denton, 0-150432, A. C., together with witnesses and all other persons or evidence required from Greenland or any other point to a Command within the United States having authority to convene general courts martial. In this connection, it is recommended that consideration be given to the feasibility of using the facilities of the Pleadquarters, First Air Force atMitchel Field, New York.
(b) In accordance with the communication quoted in paragraph (a) of this finding, steps were taken whereby the plaintiff was transferred from the Greenland Base Command, and the charges against the plaintiff were forwarded from the War Department, to the Headquarters of the First Air Force at Mitchel Field, New York.
30. The Commanding General of the First Air Force was empowered to appoint general courts-martial pursuant to Article of War 8 (41 Stat. 788).
31. (a) A general court-martial was appointed by Major General Ralph Royce, the Commanding General of the First Air Force, on August 24, 1943. The order appointing the court-martial designated Captain Harry V. Osborne, Jr., of the Judge Advocate General’s Department, as trial judge advocate; Captain Howard B. Vail, of the Air Corps, as assistant trial judge advocate; Lieutenant Colonel Gregory F. Keenan, of the Air Corps, as defense counsel; and Cap *878 tain. Adolph J. Eckhardt, of the Quartermaster Corps, as assistant defense counsel.
(b) Captain Harry V. Osborne, Jr., had been a civilian attorney practicing in New Jersey prior to World War II. He began the practice of law in 1937. During his military service, Captain Osborne had participated in many court-martial cases.
(c) The evidence does not show whether Captain Howard B. Vail was a licensed attorney.
(d) Lieutenant Colonel Gregory F. Keenan was not a licensed attorney.
(e) Captain Adolph J. Eckhardt had been a civilian attorney practicing in the State of New York prior to World War II. He began the practice of law in 1939. During his military service, Captain Eckhardt, although not a member of the Judge Advocate General’s Department, had been detailed to try many cases before courts-martial. In some cases, he had served as the trial judge advocate; and in others he had served as the defense counsel.
32. On August 26, 1943, the charges against the plaintiff were referred by the Commanding General of the First Air Force to the trial judge advocate of the general court-martial referred to in finding 31 for trial.
33. On August 27, 1943, Lieutenant Colonel Gregory F. Keenan, the defense counsel of the general court-martial mentioned in finding 31, submitted to the Commanding General of the First Air Force, on the plaintiff’s behalf, a formal request that arrangements be made for Captain John Conway Cook to be ordered to Mitchel Field on temporary duty in order to act as the plaintiff’s individual defense counsel pursuant to Article of War 17 (41 Stat. 790).
34. At about the time of the submission of the formal request for the services of Captain John Conway Cook as the plaintiff’s individual defense counsel, Lieutenant Colonel Gregory F. Keenan conferred with the Staff Judge Advocate of the First Air Force and stated that he would like to be relieved as defense counsel of the court-martial. He explained that since he was not a lawyer, he did not regard himself as qualified to handle the plaintiff’s case, which involved the possibility of a death sentence. The Staff *879 Judge Advocate stated in reply that he considered Lieutenant Colonel Keenan to be as well qualified as any other officer at the First Air Force Headquarters; that no one else was available to take his place; and that he would have to.continue with the case.
35. (a) The plaintiff’s request for the services of Captain John Conway Cook as individual defense counsel was forwarded through the Office of the Judge Advocate General of the Army to the Headquarters of the Army Air Forces Southeast Training Center at Maxwell Field.
(b) Captain Cook was willing to go to Mitchel Field for the purpose of acting as the plaintiff’s individual defense counsel.
(c) Except for any conflict that might arise because Captain Cook had been designated to participate in a court-martial trial at Maxwell Field in September 1943, Captain Cook’s immediate superior, the Staff Judge Advocate of the Army Air Forces Southeast Training Center, indicated that he was willing to relieve Captain Cook temporarily of his duties as Assistant Staff Judge Advocate in order that he might act as the plaintiff’s individual defense counsel. The court-martial trial at Maxwell Field mentioned in the preceding sentence was expected to begin on September 16 and to continue for several days.
(d) The Headquarters of the Army Air Forces Southeast Training Center informed the Office of the Judge Advocate General of the Army, which in turn informed the Commanding General of the First Air Force in a communication dated September 14, 1943, that it was expected that Captain Cook would be available on September 20, 1943 to act as the plaintiff’s individual defense counsel, but that his appearance at Mitchel Field on that date could not be guaranteed. The communication from the Office of the Judge Advocate General to the Commanding General of the First Air Force further stated that:
* *_ * Under these circumstances it is believed this situation should be explained in writing to military defense counsel appointed to defend Major Denton who should likewise be advised that the trial will be held 23 September 1943 whether or not Captain Cook can *880 arrange to be present assuming this is agreeable to your Headquarters.
36. (a) Upon the receipt by the First Air Force Headquarters of the communication from the Office of the Judge Advocate General of the Army mentioned hi finding 35 (d), the plaintiff’s trial by court-martial was scheduled for September 23, 1943. Shortly after the trial date was fixed, however, information was received at Mitchel Field to the effect that Captain Cook would not be able to leave Maxwell Field until September 24, 1943. Lieutenant Colonel Gregory F. Keenan, the regularly appointed defense counsel, thereupon submitted to the Commanding General of the First Air Force a request that the plaintiff’s trial by court-martial be postponed from September 23 to September 30, 1943. The reason for the request was stated in the following language:
This request is made in view of the fact that Captain John C. Cook, AC, requested by the defendant as Associate Defense Counsel, will not be available until 24 September 1943. Captain Cook is expected to arrive at Mitchel Field on or about 26 September 1943, and 3 days are allowed for the preparation by Captain Cook of the case.
(b) As a result of the request quoted in paragraph (a) of this finding, the plaintiff’s trial by court-martial was reset for September 27,1943.
37. (a) On or about September 20,1943, the plaintiff was informed by the Headquarters of the First Air Force in writing that “This headquarters has been advised by the War Department that Captain John C. Cook, requested by you as individual defense counsel, will not be available for that purpose.”
(b) It is reasonable to infer that the information from the War Department referred to in paragraph (a) of this finding was based upon a communication which the Department had received from the Headquarters of the Army Air Forces Southeast Training Center to the effect that Captain Cook’s commanding officer, the Commanding General of the Army Air Forces Southeast Training Center, had finally decided that Captain Cook would not be released temporarily from his regular duties in order that he might act as *881 individual defense counsel for the plaintiff. The evidence does not show the specific reason or reasons why the Commanding General of the Army Air Forces Southeast Training Center made this decision.
(c) Captain Cook was occupied in the performance of his regular duties as Assistant Staff Judge Advocate of the Army Air Forces Southeast Training Center during the period of the plaintiff’s court-martial trial.
38. Upon learning that Captain John Conway Cook would not be present at the plaintiff’s trial by court-martial, Lieutenant Colonel Gregory F. Keenan, the regularly appointed defense counsel, promptly conferred with the Staff Judge Advocate of the First Air Force. Lieutenant Colonel Keenan stated that since the defense counsel and assistant defense counsel had expected Captain Cook to play the principal role in defending the plaintiff, they had not made thorough preparations for the trial; and that a further postponement of the trial to a date later than September 27, 1943 was desired in order that additional preparation might be made. The Staff Judge Advocate indicated an unwillingness to recommend a further postponement of the trial. No formal request for such postponement was made by the defense counsel.
39. (a) After receiving information regarding Captain John Conway Cook’s unavailability, the plaintiff on September 21, 1943 submitted to the Headquarters of the First Air Force a request that Lieutenant Colonel Donald B. Brummel, Air Corps, be detailed as the plaintiff’s individual defense counsel. This request was granted.
(b) Lieutenant Colonel Donald B. Brummel’s qualifications are not shown by the evidence.
40. (a) On September 25, 1943, Captain Harry V. Osborne, Jr., was relieved as trial judge advocate of the general court-martial mentioned in finding 31, and was designated to serve as assistant trial judge advocate; and Major Joseph Smith, of the Judge Advocate General’s Department, was designated as trial judge advocate.
(b) Major Joseph Smith had been a civilian practicing attorney prior to World War II. He began the practice of law in 1921.
*882 41. (a) The trial of the plaintiff before the general court-martial mentioned in finding 31 on the charges quoted in finding 23 (b) began on September 27 and was concluded on September 28,1943.
(b) The conduct of the trial for the prosecution was handled by Captain Harry V. Osborne, Jr., assistant trial judge advocate. Although Major Joseph Smith, trial judge advocate, was present throughout the trial, and Captain Howard B. Vail, assistant trial judge advocate, was present during the first day of the trial, neither Major Smith nor Captain Vail took an active part in the proceedings.
(c) The conduct of the trial for the defense was handled principally by Captain Adolph J. Eckhardt, assistant defense counsel. However, Lieutenant Colonel Gregory F. Keenan, defense counsel, participated actively in the proceedings. Lieutenant Colonel Donald B. Brummel, the plaintiff’s individual defense counsel, was present at the trial but did not take an active part in it.
42. The plaintiff has not pointed out any instance of dereliction of duty upon the part of Lieutenant Colonel Gregory F. Keenan or Captain Adolph J. Eckhardt in connection with the defense of the plaintiff, or any instance wherein Lieutenant Colonel Keenan or Captain Eckhardt demonstrated a lack of reasonable competence, to the prejudice of the substantial rights of the plaintiff.
43. At the end of the plaintiff’s trial by general court-martial, the court-martial found the plaintiff guilty of the specification and of the charge, and sentenced him to be dismissed from the service, to forfeit all pay and allowances due or to become due, and to be confined at hard labor for 12 years.
44. On October 14, 1943, the Commanding General of the First Air Force approved the plaintiff’s sentence and forwarded the record of trial to the Office of the Judge Advocate General of the Army for action under the provisions of Article of War 48 (41 Stat. 796-797).
45. (a) In an opinion (CM 242132) dated November 23, 1943, a Board of Review in the Office of the Judge Advocate General of the Army considered the plaintiff’s conviction by court-martial and came to the following conclusion:' '
*883 The court was legally constituted. No errors injuriously affecting the substantial rights of the accused were committed during the trial. The Board of Review is of the opinion that the record of trial is legally sufficient to support the findings of guilty and the sentence, and to warrant confirmation of the sentence. Dismissal is authorized upon conviction of a violation of the 64th Article of War.
(b) On December 24, 1943, the Judge Advocate General of the Army forwarded the plaintiff’s case to the Secretary of War for the action of the President. In doing so, the Judge Advocate General stated in part as follows:
I concur in the opinion of the Board of Review that the record of trial is legally sufficient to support the findings of guilty and the sentence, and to ivarrant confirmation of the sentence. * * *
However, the Judge Advocate General conceded “that the language of the order transferring accused to the Greenland Base Command is unusual and is unsldllfully drawn,” but he expressed the opinion that the order “contains no real ambiguity.” The Judge Advocate General suggested that the term of confinement assessed against the plaintiff was “unnecessarily severe,” and he recommended that the period of confinement be reduced to three years.
46. By means of a communication dated May 22,1944, the Under Secretary of War transmitted the plaintiff’s case to the President. The communication stated (among other things) that “The order transferring accused to the Greenland Base Command was unsMllfully drawn, but without real ambiguity assigned him to duty in that command.” The communication further stated that the Under Secretary concurred in the recommendation of the Judge Advocate General that “the sentence to dismissal, total forfeitures and confinement at hard labor for twelve years be confirmed but that the period of confinement be reduced to three years and that the sentence as thus modified be carried into execution.” The Under Secretary went on to say, however, that “if it should be deemed appropriate to remit the forfeitures and confinement adjudged, I would interpose no objection * *
*884 47. On August 10, 1944, the plaintiff’s sentence was confirmed by the President, except that the President remitted the forfeitures and confinement. The President directed that the sentence, as modified, be carried into execution.
48. General Court-Martial Orders No. 440, issued by the War Department on August 16, 1944, declared that:
Major Marion Gray Denton, 0-150432, Air Corps Reserve, ceases to be an officer of the Army at midnight 19 August 1944.
49. (a) In the summer of 1945, the Honorable Sherman Minton, who was then a Judge of the United States Circuit Court of Appeals for the Seventh Circuit but was temporarily serving as Chairman of the War Department Clemency Board, obtained from the Judge Advocate General of the Army the record of the plaintiff’s conviction by a general court-martial. The plaintiff’s case was not within the scope of the Clemency Board’s jurisdiction, and the evidence does not show why Chairman Minton interested himself in the case.
(b) A few days after obtaining the court-martial record, Chairman Minton returned it to the Judge Advocate General of the Army and orally discussed the plaintiff’s case with the Judge Advocate General. Chairman Minton expressed the view that the order assigning the plaintiff to the Greenland Base Command (see finding 13) was ambiguous and was subject to the construction that the plaintiff had placed upon it. The Judge Advocate General of the Army indicated to Chairman Minton that some action respecting the plaintiff would probably be taken.
50. In a communication dated October 4, 1945 from the Personnel Division of the War Department General Staff to the Adjutant General of the Army, it was indicated that the Secretary of War directed “That * * * Major Marion Gray Denton, 0-150432, Auburndale, Florida, formerly assigned Serial Number 0-150432, Air Corps Reserve, will be called to active duty in the grade of major on 8 October 1945 and placed on inactive duty status not later than one week thereafter”; and “That at the time Major Denton is *885 placed on inactive status he will be tendered an appointment in the Officers’ Reserve Corps in the grade of Major.”
51. (a) Upon receiving the communication referred to in finding 50, the Adjutant General of the Army transmitted the following telegram to the plaintiff at Auburndale, Florida, on October 5,1945:
PROCEED OCTOBER EIGHT DREW FIELD FLORIDA REPORT COMMANDING OFFICER THREE NAUGHT ONE AIR FORCE BASE UNIT SEPARATION CENTER PD APPOINTMENT LETTER AND ORDERS AWAIT DUTY STATION PD THIS TELEGRAM TRAVEL AUTHORITY SO 238/20 END
52. After receiving the telegram of October 5, 1945 from the Adjutant General of the Army, the plaintiff proceeded from his home in Auburndale, Florida, to Drew Field, Florida, on October 8, 1945. The distance between the two places was approximately 43 miles. No orders or other information relating to the plaintiff’s recall to active military duty had been received at Drew Field. The personnel at Drew Field told the plaintiff that he could leave his telephone number at that Headquarters and return to his home, and that he would be notified by telephone subsequently when the orders relating to him had been received. The plaintiff thereupon returned to his home.
53. The Headquarters at Drew Field notified the Adjutant General of the Army that the plaintiff had reported in accordance with the telegraphic instructions to him, but that the War Department Special Orders cited in the instructions had not been received at Drew Field. The Adjutant General was requested to clarify the plaintiff’s status and to furnish a summary of the War Department Special Orders that apparently had been issued with respect to the plaintiff.
54. On October 13, 1945, the Adjutant General of the Army transmitted to the Commanding Officer of Drew Field a telegram stating as follows:
MARION GRAY DENTON 0-15 0432 GIVEN NEW APPOINTMENT MAJOR AIR RESERVE 4 OCT 4 5 PD ORDERED ACTIVE DUTY 8 OOT 45 BY WD SO 238 PAR 20 1945 TO REMAIN ON ACTIVE DUTY SHORT PERIOD FOR OPPORTUNITY TO BE SEPARATED FROM SERVICE UNDER HONORABLE CONDITIONS END
*886 55. (a) On October 22, 1945, there was received at Drew Field a letter from the Adjutant General of the Army addressed to the plaintiff. The personnel at Drew Field promptly notified the plaintiff by telephone concerning the receipt of this letter; and the plaintiff proceeded from Au-burndale to Drew Field on October 28, 1945. The letter was delivered to the plaintiff when he arrived at Drew Field. The personnel at Drew Field also furnished to the plaintiff the information contained in the Adjutant General’s telegram of October 18,1945 (see finding 54).
(b) The letter mentioned in paragraph (a) of this finding was dated October 4,1945 and stated in part as follows:
1. By direction of the President, you are tendered an appointment in the Officers’ Reserve Corps, Army of the United States, effective this date, in the grade and section shown after A above. Your serial number and length of active service in your present or any higher grade are shown after B and C above respectively.
2. There is inclosed herewith a form for oath of office, which you are requested to execute and return promptly to the agency from which it was received by you. The execution and return of the required oath of office constitute an acceptance of your appointment. No other evidence of acceptance is required. Upon receipt in the War Department of the oath of office, properly executed, a commission evidencing your appointment will be sent to you.
(c) It was indicated after “A” in the letter quoted in paragraph (b) of this finding that the grade and section of the commission offered the plaintiff were “Major, Air-Res.”; and it was indicated after “B” that his serial number was “0150432”. The space after “C”, relating to length of active service in the grade of major or any higher grade, was blank.
56. On October 23,1945, the plaintiff wrote the following letter to the Adjutant General of the Army:
On October 8th, 1945 I reported to Drew Field, Florida in compliance with directive contained in telegram AGO WD, 6 October 1945.
I have been unaware of basis for active duty orders, until this date when appointment letter and allied papers, above reference were delivered at duty station.
*887 Subject letter indicates that I have had no prior service though assigning a serial number held by me for twenty-five years.
To accept this new appointment would leave my status most ambiguous and with many possible interpretations thereof.
Therefore, in compliance with instructions contained on reverse of “Oath of Office” form, the appointment above referred to is herewith declined, and you will please note the fact of non appectance [sic].
Since appointment letter and Par 20 SO 238 are evidently in conflict, it is desired to retain the letter as evidence of that fact.
57. Under the date of December 7, 1945, the Adjutant General of the Army replied to the plaintiff’s letter of October 23,1945 by stating in part as follows:
2. Your entry on active duty 8 October 1945 pursuant to paragraph 20, Special Orders 238, War Department, 1945, was a constructive acceptance of the appointment as Major? Air Corps Reserve, tendered you on 4 October 1945. Since your former commission had terminated, you could not have been placed on active duty as an officer except under the new appointment. If you will return the appointment, letter to this office, your prior service will be entered in the space provided therefor.
3. If you do not desire to continue in your status as Major, Air Corps Reserve, you may submit your resignation by letter, stating your reasons and it will be given consideration.
58. Under the date of December 24, 1945, the plaintiff wrote the following letter to the Adjutant General of the Army:
Letter of 7 December 1945 * * * was fowarded [sic] to me from my home in Auburndale, Florida.
The conclusion reached in Par. 2 thereof as to constructive acceptance of appointment “tendered on 4 October 1945” is based on inaccurate statement of fact.
Tender of appointment was made October 23rd, 1945 “as of” 4 October 1945.
On that day appointment was declined and fact of non acceptance indicated as provided in instructions incident thereto.
Resignation therefore is not only unnecessary but undesirable.
*888 In view of the discrepancy indicated, it will be appreciated if the fact of non-acceptance be acknowledged and records of your office so corrected.
59. Under the date of 30 March 1946, the Adjutant General of the Army wrote to the plaintiff as follows:
Reference is made to your recent letter. An attempt has been made by the War Department to reestablish your commissioned status in order that you could be separated from the service under honorable conditions.
For that reason, you were appointed a major in the Air Corps Reserve on the fourth of October, 1945 and ordered to duty effective 8 October 1945 in order that you could serve for a short period and then be relieved, thereby establishing your status as an officer who has served during this war and was relieved from duty under honorable conditions. It was believed at that time that you would be glad to avail yourself of this opportunity. _ _
_ _ If you care to accept this appointment in order to reestablish your status, you may do so by accomplishing the inclosed oath of office. If, however, you do not desire this appointment, it is requested that you return your appointment, letter dated 4 October 1945 to this office and the case will be considered closed.
60. Under the date of April 25, 1946, the plaintiff wrote the following letter to the Adjutant General of the Army:
Reference is made herewith to yours of 30 March 1946, which is acknowledged, and its reference is AGPS-D 201 Denton, Marion Gray (30 mar 46).
I am unable to understand how it is possible to “reestablish” my status, by the acceptance of mother commission.
Previously I have stated that to accept such an appointment would only confuse my status, and since my previous decision was considered after due deliberation, I see no reason to change it at this time.
61. (a) Under the date of May 20, 1946, the Adjutant General of the Army addressed the following communication to the plaintiff:
1. Reference is made to your recent appointment in the Officers’ Reserve Corps, Army of the United States.
2. Since no record is found of receipt of acceptance of the appointment tendered, it is requested that the attached oath of office be executed in accordance with in *889 structions on the reverse side thereof and returned to this office. Inclosed is a franked envelope for your convenience.
3. In the event an oath of office is not received in this office within 30 days from date of this letter, your appointment in the Officers’ Reserve Corps will be can-celled.
(b) Under the date of September 4, 1946, the Adjutant General of the Army addressed to the plaintiff a communication that was identical with the communication set out in paragraph (a) of this finding.
62. In a communication dated September 13, 1946, the Adjutant General of the Army notified the plaintiff “By order of the Secretary of War” that:
So much of par 20 SO 238 WD 1945, as orders you to active duty, is hereby revoked.
63. In a communication dated September 16, 1946, the plaintiff was informed by the Adjutant General of the Army “By order of the Secretary of War” that:
Your declination of the appointment as Major, Air Corps Reserve, tendered to you on 4 October 1945, has been recorded as of 25 April 1946.
64. A communication dated November 26, 1946 from the Adjutant General of the Army to the plaintiff amended the previous communication of September 16, 1946 so as “to show declination of the appointment as Major, Air Corps Reserve, tendered you on 4 October 1945 has been recorded as of 23 October 1945.”
65. On May 29, 1952, the plaintiff petitioned the Judge Advocate General of the Air Force for a new trial under Section 12 of the Act of May 5, 1950 (64 Stat. 107, 147), seeking thereby to have the sentence of the general court-martial against him vacated. After a hearing held on July 15, 1952 before a board of officers constituted by the Judge Advocate General of the Air Force, the Judge Advocate General denied the plaintiff’s petition on September 12,1952.
66. Sometime between September 24, 1953 and October 7, 1953, the plaintiff made application to the Department of the Air Force for the correction of his military record respecting his conviction by a general court-martial. In *890 a registered letter dated May 12, 1954, the Executive Secretary of the Air Force Board for the Correction of Military Records advised the plaintiff, by direction of the Chairman of the Board, that a sufficient basis for a hearing of his case had not been established and, therefore, that his application was denied.
67. The evidence does not show the amount of the plaintiff’s earnings subsequent to his dismissal from the Army on August 19,1944.
CONCLUSION OF LAW [1]
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and his petition is therefore dismissed.

 The Articles of War were subsequently superseded by the uniform Code of Military Justice (Act of May 5, 1950, 64 Stat. 107).

 In connection -with this finding, it perhaps should be noted that any command received from an officer of superior rank was presumedi to be a lawful command, and specific proof establishing the lawfulness of such a command was not required in the absence of evidence tending to overcome the presumption of lawfulness. Manual for Courts-Martial (1928 ed., corrected to April 20, 1943), par. 134.

 The phrase, “by direction of the President,” was used so that the plaintiff, as a rated military pilot, might assume command pursuant to Article of War 119 (41 Stat. 811) and paragraph 4 of Army Regulations No. 600-20, Changes 1 (Dec. 30, 1942), without regard to the plaintiff’s seniority of rank in relation to other personnel of the post.

 See footnote 3.

 The evidence does not show the Identity or the movements of the lieutenant colonel.

 He had been promoted from captain to major during the Interval since January 1943.

 The runway at BH-2 was partially completed at that time.

 Art. 27 (b) of the Uniform Code of Military Justice (64 Stat. 117) now requires that the defense counsel of a general court-martial shall be a person with professional legal training.

 This pertains to Case No. 49800 only.